## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

HUMANITARY MEDICAL
CENTER INC.,

     Plaintiff,

v.                                 Case No. _____

JOSE ARTICA; LAZARO AVILA;
JUAN CRUZ; and QUALITY CARE
HEALTH SERVICES, INC.,

     Defendants.

_____/

## VERIFIED COMPLAINT - INJUNCTIVE RELIEF SOUGHT

### SUMMARY OF CLAIMS

Plaintiff Humanitary Medical Center Inc. (the "Company" or "Plaintiff") is a full service medical company with medical centers at 6607 N. Dale Mabry Highway, Tampa, FL 33614; 731 S. Parsons Ave., Brandon, FL 33511; and 6500 66th Street N., Pinellas Park, FL 33687.  The Company's services include primary care, mobile, optometry, wellness, dental, physical therapy, psychology, x-ray, pharmaceutical, nursing, emergency, research and laboratory.  The Company offers its patients these services as part of an established network of medical providers, insurers, health maintenance organizations ("HMO"), and management services organizations ("MSO"); all of which are centered around primary care physician relationships with patients.  The Company specializes in treating

Spanish speaking patients.  The Company is rapidly expanding geographically and into additional medical services.

Defendant Jose Artica ("Artica") was the Chief Operating Officer ("COO") of the Company from its inception until March 24, 2023.  Artica is the Owner and President of Defendant Quality Care Health Services, Inc. ("Quality Care").

Quality Care was created by Artica and Juan Carlos Cruz ("Cruz") on January 18, 2023, while Artica was still the COO of the Plaintiff.  Quality Care's principal place of business is 4311 W Waters Ave, Unit 304, Tampa, FL 33614.[1]  Quality Care purports to offer mobile home health services.  Quality Care received its Florida Agency of Healthcare Administration license (No. 299995831) on June 12, 2023.  Quality Care specializes in treating Spanish speaking patients.  Quality Care offers its patients medical services as part of an established network of providers, insurers, HMOs, and MSOs; all of which is centered around primary care physician relationships with patients.  Quality Care's network is not the Company's network.

Defendant Lazaro Avila ("Avila") was the Company's team lead for marketing and community outreach until mid-May 2023, when he quit to go work for Quality Care.

Quality Care's Co-Owner and Vice President, Defendant Cruz, is a seasoned medical industry entrepreneur in Tampa Bay and is at the center of a medical

---

[1] Quality Care's Articles of Incorporation and other corporate documents located on the Florida Secretary of State's website are attached hereto collectively as **Exhibit "A."**

network servicing Spanish speaking patients.  Cruz, along with Artica, runs the day-to-day operations of Quality Care.  Cruz is the Owner of Sunshine Adult Day Care, Inc. ("Sunshine Day Care"), a medical facility for mentally challenged or impaired adults.[2]  Sunshine Day Care's principal place of business and medical facility is located at 6626 Hanley Rd., Tampa, FL 33634.  Cruz is the President of Essential Clinic Research LLC ("Essential Clinic"), whose principal address is 4311 W Waters Ave., Suite 304, Tampa, FL 33614 (the same address as Quality Care).  The Vice President of Essential Clinic is nurse practitioner Angel Oreste Feito Madrigal, who used to work for the Company.  4311 W Waters Ave., Suite 304, Tampa, FL 33614, Quality Care's principal address and Essential Clinic's principal address, is also the principal address for Psych Me Health Services Inc.,[3] Psych Me Medical Research Inc., and Essential Mental Health Inc.  Cruz's network is not part of the Company's network.  Cruz's network is a competing network.

Plaintiff recently learned that Artica, Avila, Cruz, and Quality Care (collectively, "Defendants") are engaging in a concerted and expansive campaign to destroy the Company and to step into the shoes of the Company.  Artica and Quality Care misappropriated the Company's confidential business and trade

---

[2] Sunshine Day Care's Articles of Incorporation and other corporate documents located on the Florida Secretary of State's website are attached hereto collectively as **Exhibit** "**B**."

[3] Amy Marie Hernandez, M.D. ("Dr. Hernandez") is a medical doctor working with Psych Me Health Services Inc.  Dr. Hernandez has been affiliated with the Company through her husband, nurse practitioner Angel Orested Feito Madrigal, who worked for the Company in the past.

secret information in order to unfairly compete with the Company by soliciting the Company's patients, employees, and vendors to derive a financial benefit. Defendants are knowingly using the Company's confidential business and trade secret information in order to unfairly compete with the Company. Defendants are reaping financial gain and increased market share by these unlawful acts. Defendants' actions are in violation of numerous federal and state laws.

The Company has requested that Defendants return the Company's confidential business and trade secret information, cease soliciting the Company's patients to change primary care physicians, and cease soliciting the Company's employees but Defendants have ignored these requests. Defendants' refusal to comply has caused ongoing injury to the Company. This lawsuit is filed to protect the Company's confidential business and trade secret information and to stop Defendants from destroying the Company by way of improperly soliciting Plaintiff's patients and employees. Accordingly, for the conduct alleged herein, Plaintiff hereby seeks injunctive relief and damages pursuant to the following causes of action:

1) Artica, Avila, and Quality Care for misappropriation of trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.;

2) Artica, Avila, and Quality Care for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 *et seq*.;

3) Artica and Avila for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., and against Quality Care as vicariously and/or indirectly liable for Artica and Avila's violation;

4)      Artica for breach of contract for violations of his non-competition and non-solicitation agreements with the Company;

5)      Artica, Cruz, and Quality Care for engaging in unfair and deceptive business practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*;

6)      Avila and Artica's breach of his duty of loyalty that he owed to the Company during his employment;

7)      Artica, Avila, and Quality Care for tortious interference with the Company's advantageous business relationship;

8)      Artica, Cruz, and Quality Care for being unjustly enriched;

9)      Avila for breach of his non-competition and non-solicitation agreements with the Company; and

10)     Injunctive Relief.

In support of its claims, the Company states as follows:

## PARTIES

1.      Plaintiff is a medical company with a principal place of business located at 6607 N. Dale Mabry Highway, Tampa, FL.

2.      Artica is an individual over eighteen (18) years of age who was the COO of the Company until March 24, 2023 and is the owner of Quality Care.  Artica is also the President of Quality Care.  At all times relevant to this action, Artica has resided at 1305 Chilt Dr., Brandon, FL 33510.  Artica is an agent and manager of Quality Care.

3.      Cruz is the Co-Owner and Vice President of Quality Care.  Cruz is also the Owner of Sunshine Day Care and the President of Essential Clinic.  Cruz was intimately involved in the creation of Quality Care and assisted Artica in his efforts

to have Quality Care step into the shoes of the Company, in part, by misappropriating the Company's confidential business and trade secret information. Cruz is actively involved in the Company's patients changing primary care physicians, which causes the patients to become part of Quality Care's network, which includes Sunshine Day Care and Essential Clinic.

4.      Avila is an individual over eighteen (18) years of age who was the Company's team lead for marketing and community outreach until mid-May 2023, when he quit to work for Quality Care. Avila reported to Artica while Artica worked for the Company. At all times relevant to this action, Avila has resided at 6002 N. Grady Ave., Tampa, FL 33616. Avila is an agent and manager of Quality Care.

5.       Quality Care is a medical company with a principal place of business located at 4311 W Waters Ave, Unit 304, Tampa, FL 33614. Quality Care shares a principal place of business with Essential Clinic, Essential Mental Health Inc., Psych Me Health Services Inc.[4] and Psych Me Medical Research Inc.

**JURISDICTION AND VENUE**

6.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because several of the causes of action arise under federal law.

7.      The Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367 because they arise from the same set of

---

[4] Dr. Hernandez is a medical doctor working with Psych Me Health Services Inc. Dr. Hernandez has been affiliated with the Company through her husband, nurse practitioner Angel Orested Feito Madrigal, who worked for the Company in the past.

operative facts as the federal law causes of action.

8.     This Court has personal jurisdiction over Artica because he is a citizen and resident of Florida.  Further, the Court has personal jurisdiction over Artica because this lawsuit arises out of or relates to Artica's actions that were purposefully directed towards Florida, such as torts related to his unlawful conduct against Plaintiff, which is located in Florida, and his management of the Company and Quality Care, both of which are Florida companies.

9.     This Court has personal jurisdiction over Avila because he is a citizen and resident of Florida.  Further, the Court has personal jurisdiction over Avila because this lawsuit arises out of or relates to Avila's actions that were purposefully directed towards Florida, such as torts related to his unlawful conduct against Plaintiff, which is located in Florida, and his management of the Company and Quality Care, both of which are Florida companies.

10.     This Court has personal jurisdiction over Cruz because he is a citizen and resident of Florida. Further, the Court has personal jurisdiction over Cruz because this lawsuit arises out of or relates to Cruz's actions that were purposefully directed towards Florida, such as torts related to his unlawful conduct against Plaintiff, which is located in Florida, and his management of Quality Care, which is a Florida company.

11.     This Court has personal jurisdiction over Quality Care because it is a Florida company and because this lawsuit arises out of or relates to torts arising from its actions in Florida, such as unfair competition with Plaintiff, a Florida

company.

12.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, Cruz, Artica and Avila reside in this judicial district, and the Company and Quality Care have their principal places of business in Tampa Bay, Florida.

## FACTUAL ALLEGATIONS

13.     The Company was founded in 2019 by Dr. Eliecer Gonzalez, a Cuban immigrant, as a medical company specializing in treating Spanish speaking patients.

14.     Between 2019 and now, the Company has expanded to three facilities located at 6607 N. Dale Mabry Highway, Tampa, FL 33614; 731 S. Parsons Ave., Brandon, FL 33511; and 6500 66th Street N., Pinellas Park, FL 33687.  Since 2019, the Company has expanded its medical services to include primary care, mobile, optometry, wellness, dental, psychology, physical therapy, x-ray, pharmaceutical, nursing, emergency, and laboratory.

15.     The Company operates its business through an established network of medical service providers, insurers, HMOs, and MSOs.  The Company's network is centered around primary care physician relationships with patients and referrals stemming therefrom.  A patient's primary care physician determines what network that patient will be a part of.  Humanitary accepts patients that pay with cash and multiple forms of insurance but not all forms of insurance.

16.     The Company is rapidly expanding geographically and into additional

medical services.

17.     Artica was the COO of the Company until March 24, 2023 when he was terminated for concurrently operating a competing company, Quality Care.

18.     Artica managed the day-to-day operations of the Company until his termination and had unrestricted access to the Company's systems, facilities, and employees.  Artica even participated in the development of the Company's policies, procedures, and business strategy.  Artica was intimately aware of the established network that the Company is a part of and how it makes a profit.  Artica helped build and grow the network the Company profits off of.

19.     Unlike any other employee of the Company, Artica insisted on using his personal computer for his work for the Company.  Also, unlike any other Company employee, Artica insisted on using his personal cellular phone for his work for the Company and listed his personal cellular phone number on his Company business card.

20.     While he was employed by the Company, Artica misappropriated the Company's confidential business and trade secret information, including the Company's patient list, employee roster, pricing information, insurance information, billing information, and vendor information.  Artica took the information in order to start a competing business, Quality Care. Artica's misappropriation was not discovered until after his termination.

21.     At the outset of his employment with the Company, Artica executed an employment agreement (the "Employment Agreement").  A true and correct

copy of the Employment Agreement is attached hereto as **Exhibit** "**C**."

22.    Pursuant to the terms of the Employment Agreement, Artica agreed to maintain the confidentiality of the Company's confidential business and trade secret information, to return all Company property upon termination, not to compete with the Company for a period of twenty-four (24) months post-employment within a ten (10) miles radius of a Company facility, not to solicit the Company's patients, not to solicit the Company's vendors, and not to solicit for hire any of the Company's employees.

23.    Prior to his last day working for the Company, upon information and belief, Artica removed and took the signature page from the Employment Agreement from his employment file, which he had access to as the COO of the Company.

24.    At the outset of his employment with the Company, Artica also executed an acknowledgement of receipt of the Company's Employee Handbook (the "Employee Handbook") in which he agreed to comply with the Company's guidelines, rules, policies and procedures (including those established in the Employee Handbook (the "Artica Acknowledgment").  A true and correct copy of the Artica Acknowledgment is attached hereto as **Exhibit** "**D**."

25.    In the Employee Handbook, which is attached hereto as **Exhibit** "**E**," which Artica agreed to comply with via the Artica Acknowledgment, Artica agreed to maintain the confidentiality of the Company's confidential business and trade secret information, not to compete with the Company for a period of twenty-four

(24) months post-employment within a ten (10) miles radius of a Company facility, not to solicit the Company's patients for a period of twenty-four (24) months post-employment, not to conduct business with any person or entity that referred business to the Company, and not to solicit for hire any of the Company's employees for a period of twenty-four (24) months.

26.     On March 24, 2023, Artica executed a Separation Agreement and General Release with the Company (the "<u>Separation Agreement</u>"). In the Separation Agreement, in exchange for four (4) weeks of severance, Artica released all claims he may have had, known or unknown, against the Company.  In addition, Artica agreed to maintain the confidentiality of all of the Company's confidential business and trade secret information and to return all of the Company's confidential business and trade secret information in his possession. The Separation Agreement superseded all prior agreements entered into between the Company and Artica, except regarding "confidentiality, proprietary information, intellectual property, non-competition, non-solicitation, and/or trade secret obligations to the Company."  The Company is entitled to its attorneys' fees and costs pursuant to Artica's breach of the Separation Agreement.  A true and correct copy of the Separation Agreement is attached hereto as **Exhibit** "**F**."

27.     Acting as an agent of Quality Care, Artica is using the Company's confidential business and trade secret information to solicit the Company's patients, employees, vendors, and business referral sources. Artica uses information he knows about the Company to undercut the Company with patients.

Artica solicits the Company's patients to switch primary care physicians, which acts to take the patient out of the network the Company is a part of and move the patient to the network that Quality Care is a part of.  Upon information and belief, Quality Care receives referral payments from third parties each time Artica, acting as an agent of Quality Care, causes a patient to change primary care physicians to a primary care physician in Quality Care's network.

28.    Artica, acting as an agent for Quality Care, has solicited the Company's employees to quit working for the Company and to work for Quality Care.

29.    Cruz assisted and encouraged Artica regarding his bad acts and wrongdoing as it relates to the founding of Quality Care.  Cruz, a seasoned medical industry entrepreneur, coached Artica. Cruz is actively using the Company's confidential business and trade secret information, that he knows was misappropriated by Artica, to benefit Quality Care.  Cruz is actively working with Artica to get the Company's patients to change primary care physicians so that the patients exit the Company's network and enter Quality Care's network, which also includes Sunshine Day Care and Essential Clinic.

30.    In mid-May 2023, Avila quit working for the Company to go work for Quality Care.

31.    Artica solicited Avila to quit working for the Company to, instead, work for Quality Care.

32.    Avila was a business development and marketing employee for the Company. Avila actively developed and worked on new patient opportunities for

the Company.  Avila regularly worked with insurance companies and insurance agents that were part of the Company's network.

33.     At the outset of his employment with the Company, Avila executed an acknowledgement of receipt of the Employee Handbook, in which he agreed to comply with the Company's policies and procedures in the Employee Handbook (the "Avila Acknowledgment"). A true and correct copy of the Avila Acknowledgment is attached hereto as **Exhibit** "**G**."

34.     In the Employee Handbook that Avila agreed to comply with via the Avila Acknowledgment, Avila agreed to maintain the confidentiality of the Company's confidential business and trade secret information, not to compete with the Company for a period of twenty-four (24) months post-employment within a ten (10) mile radius of a Company facility, not to solicit the Company's patients for a period of twenty-four (24) months post-employment, not to conduct business with any person or entity that referred business to the Company, and not to solicit for hire any of the Company's employees for a period of twenty-four (24) months.

35.     Upon information and belief, Avila is soliciting the Company's patients and the Company's employees.

36.     Upon information and belief, Avila is using the Company's confidential business and trade secret information to undercut the Company unfairly.

37.     Upon information and belief, on behalf of Quality Care, Avila is

soliciting to do business with persons and companies that previously referred business to the Company.

38.    Avila and Artica, acting as agents of Quality Care, are actively soliciting the Company's patients to change their primary care physician and move from the Company's network to Quality Care's network.  The Company's patients have reported this activity to the Company.  As a result, the Company is losing patients and its workflow of new patients has slowed down.

39.    Avila and Artica, acting as agents of Quality Care, are actively soliciting the Company's employees to quit working for the Company and begin working for Quality Care.

40.    On June 26, 2023, to ensure that it had full control over its computer systems, databases and software, the Company engaged cybersecurity, ESI, and computer data preservation and recovery expert E-Hounds, Inc. ("E-Hounds").

41.    E-Hounds secured the Company's computer systems, databases, and software and then investigated whether Artica and/or Avila misappropriated Humanitary's confidential and proprietary trade secret information.

42.    Regarding   Artica's   misappropriation,   E-Hounds   discovered electronic artifacts establishing that Artica transferred Humanitary's confidential and proprietary trade secret information to himself personally on December 29, 2022, February 1, 2023, and February 7, 2023 (at a minimum).  Artica transferred Humanitary's confidential and proprietary trade secret information by way of download, USB drives, and potentially via email or some other Google suite

product.

43.     Regarding Avila's misappropriation, E-Hounds discovered electronic artifacts establishing that Avila transferred Humanitary's confidential and proprietary trade secret information to himself personally on May 9, 2023 via download.

## CAUSES OF ACTION

### Count I

**Misappropriation of Trade Secrets Under
the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836
(Artica, Avila, and Quality Care)**

44.     Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

45.     While employed by Plaintiff as its COO, Artica had access to all of the Company's confidential business and trade secret information.  Specifically, Artica gained non-public access to information concerning the Company's processes; the Company's network; the Company's contacts with insurance companies, insurance agents, HMOs, MSOs, and providers; the Company's marketing and business development strategy (particularly amongst the Spanish speaking population); and the Company's agreements with patients, insurance companies, and other third parties.

46.     While employed by Plaintiff as a business development and marketing employee, Avila had access to all of the Company's confidential business and trade secret information.  Specifically, Avila gained non-public access to information

concerning the Company's processes; the Company's network; the Company's contacts with insurance companies, insurance agents, HMOs, MSOs, and providers; the Company's marketing and business development strategy (particularly amongst the Spanish speaking population); and the Company's agreements with patients, insurance companies, and other third parties.

47.    The information in question is kept confidential by reasonable means, including password protection, VPNs, written agreements, data encryption, access restriction, and placing appropriate confidentiality obligations on those who have access to such information. By keeping such information confidential, the Company derives value and a competitive advantage in the medical industry, particularly in the Spanish speaking community.

48.    Artica and Avila have used such confidential business and trade secret information for their own personal benefit and to benefit Quality Care.

49.    Artica, acting as an agent of Quality Care, misappropriated the Company's confidential business and trade secret information.  Avila, acting as an agent of Quality Care, misappropriated the Company's confidential business and trade secret information.

50.    Quality Care gained access to the Company's confidential business and trade secret information and documents through Artica and Avila's misappropriation.  Quality Care knew that the Company's confidential business and trade secret information it received from Artica and Avila was confidential and obtained by improper means.

51.     Artica and Avila's misappropriation of the Plaintiff's confidential business and trade secret information was willful, wanton, and malicious, and in reckless disregard of the foreseeable and likely harm being caused to the Company.

52.     Through the misappropriation of the Company's confidential business and trade secret information, Artica, Avila, and Quality Care have proximately caused substantial injury to the Company, for which the Company is entitled to recover damages and, as permitted by the DTSA, exemplary damages.

53.     The Company has and will sustain irreparable harm as a direct and proximate result of the unlawful actions taken by Artica, Avila, and Quality Care. Unless otherwise restrained by this Court, Defendants will continue to unlawfully utilize the Company's confidential business and trade secret information to unfairly compete with the Company and cause the Company irreparable injury, including reputational harm, for which there will be no complete and adequate remedy at law.

54.     Artica, Avila, and Quality Care are not entitled to any benefits, payments, or revenues that any have been realized stemming from any of Defendants' unlawful acts.  Artica, Avila, and Quality Care must disgorge and return to the Company all such benefits, payments, and revenues.  The Company is likewise entitled to a reasonable royalty and all other damages and remedies available at law, including equitable relief, compensatory damages and attorneys' fees and expenses of litigation.

## Count II

### Misappropriation of Trade Secrets Under the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.001 (Artica, Avila, and Quality Care)

55.    Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

56.    In addition to a violation of the DTSA, the allegations above which are incorporated herein by reference, also state a claim for misappropriation of trade secrets under FUTSA and Florida law.

57.    Through their misappropriation of the Company's confidential business and trade secret information, Artica, Avila, and Quality Care have proximately caused substantial injury to the Company for which the Company is entitled to recover damages and, as permitted by FUTSA, exemplary damages.

58.    The Company has or will sustain irreparable harm as a direct and proximate result of the unlawful actions taken by Artica, Avila, and Quality Care. Unless otherwise restrained by this Court, Defendants will continue to unlawfully utilize the Company's confidential business and trade secret information to unfairly compete with the Company and cause it irreparable injury, including reputational harm, for which there is and will be no complete and adequate remedy at law.

59.    Artica and Avila are guilty of the physical acts taken to misappropriate the Company's confidential business and trade secret information.

60.    Quality Care is vicariously liable for Artica and Avila's

misappropriation because Artica founded Quality Care (a competitor of the Company) and started working for Quality Care while he was still an employee of the Company.  Artica is Quality Care's owner, manager, and agent.  Avila began working for the benefit of Quality Care before he terminated his employment with Plaintiff.  On the day(s) he misappropriated the Company's confidential business and trade secret information, Avila was working for the benefit of Quality Care

61.    Artica, Avila, and Quality Care are not entitled to any benefits, payments, or revenues that they have realized stemming from any unlawful acts. Artica, Avila, and Quality Care must disgorge and return to the Company all such benefits, payments, and revenues.   The Company is likewise entitled to a reasonable royalty and all other damages and remedies available at law, including equitable relief, compensatory damages, and attorneys' fees and expenses of litigation.

## Count III

### Violation of Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 et seq. (Against Artica and Avila)

62.    The Company repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

63.    The CFAA prohibits a person from intentionally accessing a protected computer and exceeding his or her authorized access to obtain information from that protected computer.

64.    The Company's computers, systems, databases, hard drives, software

platforms, and business network constitute "<u>protected computers</u>" as defined by Section 1030(e)(2)(B) of the CFAA.

65.     On January 18, 2023, Artica incorporated Quality Care. Upon information and belief, he had already been operating Quality Care for several months before its date of incorporation. Artica was terminated by the Company on March 24, 2023 for operating a competing company. For multiple months prior to his termination, Artica gained access to, transferred, and downloaded the Company's confidential business and trade secret information to himself. The full extent of Artica's misappropriation will not be discovered until his personal computer, USBs, and cellular phone are forensically analyzed.

66.     Artica (for the benefit of himself and Quality Care) accessed, downloaded, transferred, and destroyed the Company's confidential business and trade secret information for purposes of commercial advantage, private financial gain, destruction of evidence, and/or in furtherance of his tortious acts in violation of other laws of the United States and Florida, including trade secret misappropriation and unfair competition, as claimed herein.

67.     In the middle of May 2023, Avila quit working for Plaintiff in order to work for Quality Care. Upon information and belief, for at least a few weeks prior to quitting, Avila was working for the benefit of Quality Care. In the weeks prior to quitting working for Plaintiff, Avila gained access to, transferred, and downloaded the Company's confidential business and trade secret information to himself. The full extent of Avila's misappropriation will not be discovered until his

personal computer and cellular phone are forensically analyzed.

68.   Avila (for the benefit of himself and Quality Care) accessed, downloaded, transferred, and destroyed the Company's confidential business and trade secret information for purposes of commercial advantage, private financial gain, destruction of evidence, and/or in furtherance of his tortious acts in violation of other laws of the United States and Florida, including trade secret misappropriation and unfair competition, as claimed herein.

69.   Since then, the Company has sent a letter to Defendants seeking compliance with the Company's demands.  Defendants ignored the letter.

70.   Artica and Avila's unauthorized access and manipulation of the Company's protected computers, systems, software, hard drives, business network, database, and patient information has caused and will continue to cause Plaintiff to suffer injury, with "damages" and "losses," as those terms are defined in Sections 1030(e)(8) and 1030(e)(11) of the CFAA, respectively, in excess of $5,000.00 within a one-year period.

71.   For example, the Company has already spent in excess of $5,000.00 to engage E-Hounds to conduct forensic analysis of the affected computers, systems, hard drives, databases, and networks in order to determine the activity Artica and Avila engaged in and to assess what confidential business and trade secret information was accessed, downloaded, misappropriated, deleted, or otherwise compromised.  To complete this investigation—which the Company must do, in part, because of its duties related to patient confidentiality and to

determine the full extent of what has been taken—will cost the Company tens of thousands of dollars, not including the time that the Company has invested in the initial effort to respond to and investigate Defendants' unlawful conduct.

72.     Artica and Avila's activities constitute intentionally accessing a "protected computer" without authorization or exceeding authorized access and thereby obtaining information from a "protected computer," in violation of at least 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5).

## Count IV

### Breach of Contract
### (Against Artica)

73.     Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

74.     Artica was the COO of the Company.  Artica executed the Employment Agreement, Artica Acknowledgment, and Separation Agreement.

75.     By way of written contract, Artica was under an obligation to: (a) maintain the confidentiality of the Company's confidential business and trade secret information; (b) return all Company property upon termination; (c) not to compete with the Company for a period of twenty-four (24) months post-employment within a ten (10) mile radius of a Company facility; (d) not to solicit the Company's patients for a period of twenty-four (24) months post-employment; (e) not to conduct business with any person or entity that referred business to the Company; and (f) not to solicit for hire any of the Company's employees for a

period of twenty-four (24) months post-termination.

76.    In breach of contract, Artica failed to uphold these obligations.

77.    Artica misappropriated the confidential business and trade secret information and gave it to Quality Care to directly compete with the Company.

78.    Artica founded Quality Care to directly compete with the Company, months before he was terminated by the Company and continues to operate Quality Care to this day.

79.    Quality Care's business operations regularly occur within a ten (10) mile radius of a Company facility.  Artica, as an agent of Quality Care, solicits the Company's patients to change primary care physicians, causing those patients to leave the Company's network and join Quality Care's network.

80.    Artica, as an agent for Quality Care, including through the use of Avila, is soliciting business relationships with the Company's vendors and persons or entities that refer business to the Company.  Artica is also, as an agent of Quality Care, soliciting the Company's employees, including Avila.

81.     As a result, Artica owes the Company damages and the Company's attorneys' fees and costs related to this lawsuit.

82.    The contractually specified restraints being enforced herein are reasonably necessary to protect the legitimate business interests of the Company, which include but are not limited to retaining patients, employees, trade secrets, and goodwill and protecting the Company's confidential and proprietary business information.

## Count V

### Unfair Competition Under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et. seq.* (Against Artica, Cruz, and Quality Care)

83.   Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

84.   Artica founded Quality Care while he was still an employee of the Company.  For months, Artica operated Quality Care while still employed by the Company.  Quality Care is a direct competitor of the Company.

85.   Artica caused Quality Care to step into the shoes of the Company by using the Company's confidential business and trade secret information, exploiting the Company's business relationships, and based on his intimate knowledge of the Company's marketing and business development strategy.

86.   Quality Care is actively soliciting and taking the Company's employees.

87.   Artica, as an agent of Quality Care, is soliciting the Company's patients to switch their primary care physician from a Company doctor to a doctor from a different company so that the patient changes from being part of the Company's network to become a part of Quality Care's network. This includes visiting the Company's patients in their homes and soliciting them to switch primary care physicians. Some of the Company's patients have reported Avila and Artica's actions to the Company.

88.   Cruz assisted and encouraged Artica all of the way regarding his bad

acts and wrongdoing as it relates to the founding of Quality Care and its unfair competition against the Company.   Cruz, a seasoned medical business entrepreneur, coached Artica.  Cruz is actively using the Company's confidential business and trade secret information, that he knows was misappropriated by Artica and Avila, to benefit Quality Care.  Cruz is actively working with Artica and Avila to get the Company's patients to change primary care physicians so that the patients exit the Company's network and enter Quality Care's network, which also includes Sunshine Day Care and Essential Clinic.

89.    Artica, Cruz, and Quality Care are unfairly competing against the Company.

90.    The aforementioned conduct constitutes an unfair method of competition, unconscionable act or practice, or unfair or deceptive act in violation of Fla. Stat. § 501.201 *et seq.*

91.    The aforementioned conduct has caused and will continue to cause actual and irreparable injury to the Company.

## **Count VI**

### **Breach of the Duty of Loyalty Owed to Plaintiff**
### **(Against Artica and Avila)**

92.    Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

93.    As a result of their employment with Plaintiff, and based on their senior positions with Plaintiff, Artica and Avila owed Plaintiff a duty of good faith,

honesty, candor, and loyalty in the performance of his duties.

94.    Artica founded Quality Care while he was still an employee of the Company.  For months, Artica operated Quality Care while still employed by the Company.  Avila assisted Artica and prior to ending his employment with Plaintiff, started to work against Plaintiff and for the benefit of Quality Care.  Quality Care is a direct competitor of the Company.

95.    Artica and Avila caused Quality Care to step into the shoes of the Company by using the Company's confidential business and trade secret information, exploiting the Company's business relationships, and based on his intimate knowledge of the Company's marketing and business development strategy.

96.    Quality Care is taking the Company's employees.

97.    Artica and Avila, as agents of Quality Care, are soliciting the Company's patients to switch their primary care physician from a Company doctor to a doctor from a different company so that the patient changes from being part of the Company's network to become a part of Quality Care's network.

98.    Accordingly, the coordination and calculation that necessarily preceded Artica creating an operating a competing company—all done while still employed by Plaintiff in a managerial position—cannot be construed as mere preparation for future competition with Plaintiff. It was instead an egregious breach of the duty of loyalty that Artica owed.  Avila is working with and assisting Artica and, in doing so, has egregiously breached the duty of loyalty he owed to

Plaintiff.

99.   Through their disloyal acts, Artica and Avila have proximately caused, and will continue to cause, substantial injury to Plaintiff.

100.   Artica and Avila's breaches of their duties of loyalty were willful, wanton, and malicious and in reckless disregard of those duties and Plaintiff's rights, as well as foreseeably likely.

101.   Artica and Avila are not entitled to the salaries and other compensation and benefits they were paid by Plaintiff during the period in which they breached their duties of loyalty. Such undeserved earnings should be disgorged and returned to Plaintiff, in addition to compensating Plaintiff for the additional damage Plaintiff suffered as a result of Avila and Artica's disloyalty.

## Count VII

### Tortious Interference with Business Relations
### (Against Artica, Avila, and Quality Care)

102.   Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

103.   Artica founded Quality Care while he was still an employee of the Company.  For months, Artica operated Quality Care while still employed by the Company.  Quality Care is a direct competitor of the Company.

104.   Artica and Avila are causing Quality Care to step into the shoes of the Company by using the Company's confidential business and trade secret information, exploiting the Company's business relationships, and based on his

intimate knowledge of the Company's marketing and business development strategy.

105.   Quality Care is taking the Company's employees and causing them to violate their employment agreements with the Company.

106.   Artica and Avila, as agents of Quality Care, are soliciting the Company's patients to switch their primary care physician from a Company doctor to a doctor from a different company so that the patient changes from being part of the Company's network to become a part of Quality Care's network.

107.   Artica and Avila are soliciting the Company's business referral sources to stop referring business to the Company and, instead, to refer business to Quality Care.

108.   Artica and Avila, as agents of Quality Care, are using the Company's confidential business and trade secret information, which was misappropriated, to compete against the Company.

109.   The conduct described above far exceeds the bounds of fair and lawful competition.

110.   Through Avila and Artica's knowingly tortious interference with Plaintiff's business relations, Artica, Avila, and Quality Care have proximately caused, and will continue to cause, substantial injury to Plaintiff (including loss of business).

111.   Avila and Artica's tortious interference with Plaintiff's business relations was willful, wanton, and malicious, and in reckless disregard of Plaintiff's

rights and the harm that he is causing was foreseeably likely.

112.    Because Artica and Avila were acting on behalf of Quality Care, Quality Care is also liable for Avila and Artica's tortious conduct.

## Count VIII

### Unjust Enrichment
### (Against Artica, Cruz, and Quality Care)

113.    Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

114.    The Company conferred a benefit on Artica and Quality Care by exposing Artica and Avila to its confidential business and trade secret information, including the Company's patient list, call lists, billing information, employee roster, pricing information, insurance information, and vendor information.

115.    Cruz assisted and encouraged Artica and Avila all of the way regarding his bad acts and wrongdoing as it relates to the founding of Quality Care and its unfair competition against the Company.  Cruz, a seasoned medical entrepreneur, coached Artica and Avila.  Cruz is actively using the Company's confidential business and trade secret information, that he knows was misappropriated by Artica and Avila, to benefit Quality Care.  Cruz is actively working with Artica and Avila to get the Company's patients to change primary care physicians so that the patients exit the Company's network and enter Quality Care's network, which also includes Sunshine Day Care and Essential Clinic.

116.    Quality Care, Cruz, and Artica are actively trying to step into the shoes

of the Company and are aware of how they are benefitting off of the Company's confidential business and trade secret information to do so.

117.   Quality Care, Cruz, and Artica have accepted and retained this benefit.

118.   It would be inequitable for Artica, Cruz, and Quality Care to retain the benefit that they gained through Artica's misconduct.

**Count IX**

**Breach of Contract**
**(Against Avila)**

119.   Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

120.   Avila was a business development and marketing employee for the Company.  Avila actively developed and worked on new patient opportunities for the Company.  Avila regularly worked with insurance companies and insurance agents that were part of the Company's network.

121.   At the outset of his employment with the Company, Avila executed the Avila Acknowledgment, in which he agreed to comply with the Company's policies and procedures in the Employee Handbook.

122.    In the Employee Handbook that Avila agreed to comply with via the Avila Acknowledgment, Avila agreed to maintain the confidentiality of the Company's confidential business and trade secret information, not to compete with the Company for a period of twenty-four (24) months post-employment within a ten (10) mile radius of a Company facility, not to solicit the Company's

patients for a period of twenty-four (24) months post-employment, not to conduct business with any person or entity that referred business to the Company, and not to solicit for hire any of the Company's employees for a period of twenty-four (24) months.

123.   Avila is soliciting the Company's patients and the Company's employees and is using the Company's confidential business and trade secret information, which he misappropriated, to do so.

124.   Upon information and belief, on behalf of Quality Care, Avila is soliciting to do business with persons and companies that previously referred business to the Company.

125.   Avila, acting as an agent of Quality Care, is actively soliciting the Company's patients to change their primary care physician and move from the Company's network to Quality Care's network.  As a result, the Company is losing patients and its workflow of new patients has slowed down.

126.   Avila, acting as an agent of Quality Care, is actively soliciting the Company's employees to quit working for the Company and begin working for Quality Care.

127.   The contractually specified restraints being enforced herein are reasonably necessary to protect the legitimate business interests of the Company, which include but are not limited to retaining patients, employees, trade secrets, and goodwill and protecting the Company's confidential and proprietary business information.

## Count X

## Injunctive Relief
**(All Defendants)**

128.   Plaintiff repeats and realleges each and every allegation set forth in every paragraph above as if fully set forth herein.

129.   In addition to the damages Plaintiff has suffered, Defendants are in ongoing possession of Plaintiff's confidential business and trade secret information, including Plaintiff's patient list and contact information, billing information, call lists, strategic business contracts, accounting records, and business strategy information and documents.

130.   Artica conducted the Company's business on his personal computer, which he still possesses. Upon information and belief, Artica transferred the Company's confidential business and trade secret information to that computer.

131.   Artica conducted the Company's business on his personal cellular phone, which he still possesses. Upon information and belief, Artica transferred the Company's confidential business and trade secret information to that cellular phone.

132.   Artica used USB drives, which he is still in possession of, to transfer the Company's confidential business and trade secret information.

133.   Avila transferred Humanitary's confidential and proprietary trade secret information to himself personally on May 9, 2023 via download onto an electronic device that Avila still possesses.

134.   Defendants are using the Company's confidential business and trade secret information to step into the shoes of the Company by soliciting the Company's patients to switch their primary care physician from a Company doctor to a doctor from a different company so that the patient changes from being part of the Company's network to become a part of Quality Care's network.

135.   Defendants are using the Company's confidential business and trade secret information to solicit the Company's employees.

136.   Defendants are using the Company's confidential business and trade secret information to solicit the vendors the Company does business with.

137.   Plaintiff has no adequate remedy at law to compensate for the Defendants' misconduct, including misappropriating Plaintiff's confidential business and trade secret information, poaching Plaintiff's patients, and poaching Plaintiff's employees.

138.   Defendants' continued possession and use of Plaintiff's confidential business and trade secret information poses an imminent threat of irreparable injury to Plaintiff, for which Plaintiff have no adequate remedy at law.

139.   Whenever Defendants solicit Plaintiff's patients using Plaintiff's confidential business and trade secret information, Plaintiff is entitled to equitable relief including injunctions.

140.   If Defendants are not enjoined by this Court from committing further acts of misconduct and moreover retract the damages that they have has caused, the harm that Plaintiff will suffer outweighs any harm that the issuance of an

injunction may have upon Defendants.

141.   Plaintiff has a substantial likelihood of success on the merits.

142.   Plaintiff seeks the assistance of the equitable and legal powers of this Court to prevent this irreparable damage from continuing and occurring.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully seeks a judgment in its favor and against Defendants on all claims and requests that the Court grant the following relief:

1.   Issue an injunction restraining the Defendants, and anyone acting on their behalf or in concert with them, from the following:

      a.   Taking, accessing, using, disclosing, or continuing to possess Plaintiff's confidential business information and/or trade secrets, including non-public information concerning Plaintiff's patients, billing information, contracts, business partners, business practices, call lists, accounting information, vendors, employees, and Plaintiff's unique and proprietary business know-how and requiring return of such information and documents;

      b.   Making representations that Plaintiff and Defendants are affiliated, associated, or related, or making representations intended to cause any third party to believe Defendants are

conducting business as Plaintiff, or disparaging Plaintiff;

 c. Contacting or soliciting Plaintiff's patients;

 d. Contacting or soliciting Plaintiff's employees, vendors, or business referral sources.

2. Order Artica and Avila to turnover to counsel for Plaintiff for forensic analysis the personal computer Artica used to conduct the Company's business, the personal cellular phone Artica used to conduct the Company's business, USBs used by Artica and Avila while they were accessing Plaintiff's systems, and any other electronic device or program that possesses or contains the Company's confidential business and trade secret information.

3. Require Quality Care to account to Plaintiff for and disgorge all profits derived from the diversion of patients or businesses, various breaches and unfair business practices, and/or misappropriation of Plaintiff's trade secrets, and/or those acting in concert or on their behalf.

3. Award damages to Plaintiff, including but not limited to actual damages, compensatory damages, and/or exemplary damages.

4. Award of punitive and exemplary damages and attorneys' fees and costs to Plaintiff.

6. Award any such other and further relief as may be deemed just and proper.

Dated: August 9, 2023                    HOLLAND & KNIGHT LLP

                                        */s/ David J. Lisko*
                                        David J. Lisko, FBN: 92841
                                        david.lisko@hklaw.com
                                        Jason Baruch, FBN: 10280
                                        Jason.Baruch@hklaw.com
                                        Allison Mangan, FBN: 1025549
                                        Allison.Mangan@hklaw.com
                                        100 N. Tampa Street, Suite 4100
                                        Tampa FL 33602
                                        813-227-8500

                                        *Attorneys for Humanitary Medical Center,
                                        Inc.*

## **VERIFICATION**

My name is Juan Herrera and, pursuant to 28 U.S.C. § 1746, I hereby affirm that I am over 18 years of age and am competent to make the following Verification:

(1)     I am a Vice President Healthcare Advisor of Humanity Medical Center Inc. and the Executive Liaison to the President of Humanity Medical Center Inc.;

(2)     I have read the foregoing Verified Complaint for Injunctive Relief and Damages and hereby verify that the allegations of facts contained therein are true and correct to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 9, 2023

Juan Herrera